# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2015AP231 |
| COMPLETE TITLE: | State of Wisconsin ex rel. John Krueger, Plaintiff-Appellant-Petitioner, v. Appleton Area School District Board of Education and Communication Arts 1 Materials Review Committee, Defendants-Respondents. |

REVIEW OF A DECISION OF THE COURT OF APPEALS
Reported at 370 Wis. 2d 787, 882 N.W.2d 870
(2016 – Unpublished)

| | |
|---|---|
| OPINION FILED: | June 29, 2017 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | February 15, 2017 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Outagamie |
| JUDGE: | Vicki L. Clussman |

| | |
|---|---|
| JUSTICES: | |
| CONCURRED: | ABRAHAMSON, J. concurs, joined by A.W. BRADLEY, J. (opinion filed). |
| DISSENTED: | |
| NOT PARTICIPATING: | |

ATTORNEYS:

For the plaintiff-appellant-petitioner, there were briefs filed by *Richard M. Esenberg*, *Brian McGrath, Thomas C. Kamenick,* and *Wisconsin Institute for Law and Liberty*, Milwaukee, and an oral argument by *Richard M. Esenberg.*

For the defendants-respondents, there was a brief by *Andrew T. Phillips*, *Christine V. Hamiel,* and *von Briesen and Roper, S.C.,* Milwaukee, and oral argument by *Christine V. Hamiel*.

An amicus curiae brief was filed on behalf of The Wisconsin Department of Justice by *Anne M. Bensky*, assistant attorney general, and *Brad D. Schimel*, attorney general. There was an oral argument by *Anne M. Bensky*.

An amicus curiae brief was filed on behalf of The Wisconsin Freedom of Information Counsel, Wisconsin Newspaper Association and Wisconsin Broadcasters Association by *April Rockstead Barker* and *Schott, Bublitz and Engel, S.C.*

An amicus curiae brief was filed on behalf of Wisconsin Counties Association, League of Wisconsin Municipalities, Wisconsin Association of School Business Officials, Wisconsin Association of School Personnel Administrators, Wisconsin Association of School Boards, Wisconsin Council for Administrative Services, Association of Wisconsin School Administrators, and Wisconsin Association of School District Administrators by *Joseph L. Olson* and *Michael Best & Friedrich LLP*, Milwaukee.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2015AP231
(L.C. No. 2013CV868)

STATE OF WISCONSIN           :       IN SUPREME COURT

**State of Wisconsin ex rel. John Krueger,**

       **Plaintiff-Appellant-Petitioner,**

    **v.**

**Appleton Area School District Board of Education and**

**Communication Arts 1 Materials Review Committee,**

       **Defendants-Respondents.**

**FILED**

**JUN 29, 2017**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Reversed and cause remanded.*

¶1 MICHAEL J. GABLEMAN, J. This case requires us to decide whether the Appleton Area School District's Communications Arts 1 Materials Review Committee ("CAMRC") was a governmental body subject to Wisconsin's open meetings law. John Krueger, the parent of a child who attended school in the District, sued CAMRC and the Appleton Area School District Board of Education (the "Board"), alleging that CAMRC failed to comply

with the open meetings law. The Outagamie County circuit court[1] granted summary judgment in favor of the Board and CAMRC, concluding that CAMRC was not subject to the open meetings law. We now review the unpublished decision of the court of appeals[2] that affirmed the circuit court's grant of summary judgment.

¶2 We reverse the decision of the court of appeals and hold that CAMRC met the definition of "governmental body" under the open meetings law and therefore was subject to its terms. See Wis. Stat. § 19.82(1) (2011-12).[3] Where a governmental entity adopts a rule authorizing the formation of committees and conferring on them the power to take collective action, such committees are "created by . . . rule" under § 19.82(1) and the open meetings law applies to them. Here, the Board's Rule 361 provided that the review of educational materials should be done according to the Board-approved Assessment, Curriculum, & Instruction Handbook (the "Handbook"). The Handbook, in turn, authorized the formation of committees with a defined membership and the power to review educational materials and make formal recommendations for Board approval. Because CAMRC was formed as one of these committees, pursuant to authority delegated to it

---

[1] The Honorable Vicki L. Clussman, presiding.

[2] State ex rel. Krueger v. Appleton Area Sch. Dist. Bd. of Educ., No. 2015AP231, unpublished slip op. (Wis. Ct. App. June 28, 2016).

[3] All subsequent references to the Wisconsin Statutes are to the 2011-12 version unless otherwise indicated.

by the Board by means of Rule 361 and the Handbook, it was "created by . . . rule" and therefore was a "governmental body" under § 19.82(1).

¶3    We begin by setting forth the relevant factual background surrounding the District's rules governing curriculum review and the formation and operation of CAMRC.[4]    We next analyze the statutory criteria that an entity must meet in order to be a "governmental body" subject to the open meetings law. We then apply these criteria to CAMRC, and we conclude that it was a "governmental body" under Wis. Stat. § 19.82(1) and therefore was subject to the open meetings law.

### I.  BACKGROUND

### A.  The District's Rules Governing Curriculum Review

¶4    Under the Wisconsin statutes, a school board is vested with the authority to "adopt all the textbooks necessary for use in the schools under its charge."  Wis. Stat. § 118.03(1).  In the Appleton Area School District, the Board adopted Rule 361,[5] which recognized that the Board, "as the governing body of the

---

[4] As the court of appeals recognized, the parties have agreed that there are no disputed issues of material fact. Krueger, unpublished slip op., ¶2 n.1.

[5] Rule 361 was adopted by the Board in 1993 and amended in 2003.  On October 24, 2011 (after the formation of CAMRC), the Board amended Rule 361 again and renumbered it "Rule 361.1." The parties refer to Rule 361 and Rule 361.1 interchangeably. Because there are no differences that are material to this case, and because Rule 361 was in effect at the time that CAMRC was formed, we cite to Rule 361 in this opinion.  A full copy of Rule 361 as it appears in the record is attached to this opinion as Appendix A.

3

School District, is legally responsible for all educational materials utilized within the instructional program of the [District]." Rule 361 further provided that "[t]he selection of educational materials is delegated to the professionally trained and certified personnel employed by the school system." In a section titled "Procedures for Selection of Educational Materials and Textbooks," Rule 361 provided that "[c]urriculum revision is an ongoing process as defined in the Board approved Appleton Area School District (AASD) Assessment, Curriculum, & Instruction Handbook. This Handbook delineates the processes leading to Board approval for curriculum revision, adoption of new courses, and implementation of curriculum materials." The Handbook had been developed by the District's Assessment, Curriculum, and Instruction Department (the "ACI Department") and presented to the Board for approval. The Board had voted to adopt the Handbook on January 13, 2003.

¶5 By providing in Rule 361 that the selection of educational materials was delegated to the ACI Department and by adopting the Handbook to govern the performance of those duties, the Board directed the ACI Department to follow the Handbook when recommending educational materials for Board approval. The head of the ACI Department, Kevin Steinhilber, acknowledged this in his deposition.[6] Rule 361 did not prohibit the ACI Department

_____

[6] When Steinhilber was asked if it was correct that, "in the Board's rule, it tells you that when you do curriculum revisions, you are to follow the process in the handbook," he responded, "I would agree with that."

4

from revising the Handbook or modifying Handbook procedures to fit different situations.[7] But Rule 361 nevertheless represented the Board's formal authorization for the ACI Department to review and recommend educational materials for Board approval pursuant to the processes in the Handbook.

¶6 The Handbook provides that curriculum review is to be performed on a 6-year cycle, on a course-by-course basis, by committees formed for that purpose.[8] As the Board and CAMRC explained in their responses to Krueger's discovery requests,

> The curriculum cycle, as set forth in the ACI Handbook, contemplates the formation of committees for program and course review, including provisions for the committee makeup, application process for committee membership, information to be provided to committee members, the process for conducting committee meetings, and the expected outcomes to be achieved by review committees. . . .
>
> Review committees are tasked with duties such as reviewing existing curriculum, reviewing possible materials/resources to support the curriculum, and writing course and program curriculum. . . .

---

[7] "From a practical standpoint," Steinhilber explained, the Board "acknowledg[ed] that we have developed a handbook, and that we adjust the processes we feel [are] appropriate. We also determine, you know, when that occurs, for which courses, what timelines, and we make recommendations then." But overall, he testified, the "process that we follow is that we set up a committee that reviews present curriculum, makes modifications, looks for materials, educational materials, that support that. We bring forward our recommendations to our Board, they review it, they determine what other changes they may want, and then they do Board approve [sic] that final product."

[8] The relevant portions of the Handbook as they appear in the record are attached to this opinion as Appendix B.

[Ultimately,] the curriculum recommendations are presented to the Board of Education for approval.

Indeed, the Handbook provides that the first step when beginning a curriculum review cycle is to "[e]stablish a committee for program review." The Handbook further provides that review committees are to be composed of at least 17 individuals:

> ACI Director/Coordinator; Administrators from High School (1), Middle School (1) and Elementary School (3); Teachers – High School Curriculum Support Specialists (3), Middle School Curriculum Support Specialists (4), and Elementary School (3); Special Education representative; and as pertinent TAG, Title I and ELL.

The ACI Department is supposed to select the members of the review committee by soliciting and reviewing applications from interested persons and sending the selected members "letters of acceptance with information regarding [the] first meeting."

¶7 After a review committee is formed, the Handbook authorizes the committee to perform a number of functions, including "identify[ing] possible materials/resources." Ultimately, the "committee makes the selection" of which materials or resources to recommend to the Board. The process culminates in presenting these recommendations to the Board for its approval. The Board and CAMRC, in their discovery responses, provided the following summary of the duties and functions assigned by the Handbook to be performed by review committees:

> It is not until a review committee has: (1) identified texts/materials costs; (2) revised curriculum with broad representation throughout the District; (3) identified essential learning objectives; (4) identified how standards will be addressed within a

6

course; (5) identified/developed district-wide assessments to benchmark major standards; (6) provided curriculum to department, administrators, and ACI Department for feedback; (7) made needed adjustments; (8) suggested implementation strategies for the following school year; and (9) curriculum documents [are] reviewed by the content steering committee, that the curriculum recommendations are presented to the Board of Education for approval.

All of these provisions in the Handbook demonstrate that, as the Board and CAMRC put it in their discovery responses, the "Handbook provides the basis of authority for review committees, such as CAMRC," to exist.

B. Krueger's Request and the Formation of CAMRC

¶8 In July of 2011, Krueger asked the District to create an alternative Communications Arts 1 course that would use a different reading list, consisting of materials at a ninth grade reading level with no profanities, obscenities, or sexualized content. At the time of Krueger's request, the Communications Arts course curriculum had not gone through the Handbook's review-committee process in approximately eight years. In light of the standard six-year cycle, the Communications Arts curriculum was approximately two years overdue for a review.

¶9 District officials met with Krueger and told him that they were planning to begin the review process for Communications Arts in grades 7 through 12 in about a year and a half. They hoped that the new book list that would come out of the upcoming review process would meet Krueger's request, and a new course would not be necessary. Krueger was dissatisfied with the long timeline, and District officials reconsidered.

7

They decided to go ahead and begin the review-committee process authorized in the Handbook, but only as to the book list for the Communications Arts 1 course. The book list needed updating anyway, in light of the new Common Core standards. As Steinhilber explained in his deposition, "we talked internally after that meeting" with Krueger and "determined that, well, knowing what we know about common core and needing those non-fiction materials, that we could adjust and do a modified version now knowing that we would go through a full curriculum process in the future."

¶10 Steinhilber worked with Nanette Bunnow, the District's Director of Humanities, to form CAMRC for this purpose. Bunnow testified in her deposition that, when forming CAMRC, "We used the process that was in place through [Rule] 361.1 in the Handbook in a modified process." Although Krueger's request was the impetus for forming CAMRC, it was undisputed that CAMRC was formed as a review committee pursuant to a modified version of the Handbook process.[9] According to Bunnow, the process was modified in that "we only looked at the book list" rather than reviewing and rewriting the full curriculum, "because the concern that was brought forth was related to the materials. We were not in a full curriculum cycle." Nonetheless, Bunnow said,

---

[9] For example, as Steinhilber testified in his deposition:

Q: CAMRC was a Review Committee operating under the ACI Handbook. You agree with that, right?

A: I do.

"Superintendent Allinger was interested in us doing a full review [of the materials] because they hadn't been reviewed for eight years prior." The purpose of following the Handbook process for review committees, Bunnow explained, is "to make sure that we're all following a similar process no matter which curriculum [is being reviewed]." When asked to confirm that CAMRC derived its authority and functions from Rule 361 and the Handbook (and not from anywhere else), Bunnow agreed.[10]

¶11 In forming CAMRC, Steinhilber and Bunnow "sought members the same way as we have in the past" when forming other review committees pursuant to the Handbook. "In our handbook," Bunnow testified, "we have a process where we advertise or have applications that go out and say that we are currently seeking teachers . . . that are stakeholders in the curriculum, either teach it, or have taught it, or have some knowledge related to the intent of the committee." As a result of Bunnow's solicitations, 17 people came forward and were selected for membership on CAMRC. The 17 members included eleven teachers, three Communications Arts Curriculum Support Specialists, one

---

[10] As Bunnow put it, "[Rule] 361.1 and the ACI Handbook is the process that we did follow because Superintendent Allinger asked us to address the parent concerns." This is consistent with the Board's and CAMRC's discovery responses, which stated that "CAMRC was created pursuant to a modified 6-year curriculum cycle, a process which is enumerated in the ACI Handbook." The Board and CAMRC further explained that "CAMRC's purpose and tasks are clearly enumerated by the ACI Department, and ACI Department policy guided CAMRC through the modified curriculum process, as dictated by the ACI Department." Further, "CAMRC's membership was determined as set forth in the ACI Handbook."

Library Media Specialist, and one high school principal.  Bunnow herself served as chair of the committee.

C.  The Functions and Operation of CAMRC

¶12  CAMRC held its first meeting on Monday, October 3, 2011, and the full committee met a total of eight times, always on a Monday at 3:45 p.m. in the same location.  Although CAMRC did not revise the entire curriculum for Communications Arts, CAMRC performed many of the other functions that the Handbook assigns to review committees.  It identified a list of 93 potential books for the course, it reviewed them in light of course standards, it put a proposed list out for public input, and it voted on which books to include.  CAMRC arrived at a final list of two dozen books to recommend to the Board.  All of these steps were taken in accord with duties assigned to review committees by the Handbook.

¶13  At that point in the process, Bunnow testified, "[w]e finished up the process as designed.  We took it as an item for consideration to the Board."  The book list was presented to the Board's Programs and Services Committee, which voted to approve the list and bring it before the full Board.  The full Board voted to approve the list on April 23, 2012.  Bunnow confirmed in her testimony that this "process was authorized through [Rule] 361.1 and the ACI Handbook."

¶14  The Board, too, understood CAMRC to be following the Handbook process for review committees.  Shortly after CAMRC was formed, Bunnow and Steinhilber had brought an "item of information" before the Board explaining that they had created

10

CAMRC under a modified version of the Handbook's review-committee process to review the book list for Communications Arts 1. The Board had an opportunity to ask questions or to request a vote if it did not approve of the modifications to the review-committee process for CAMRC. Diane Barkmeier, a member of the Board, testified that her understanding was that CAMRC was "part of the curriculum and materials review process." Recalling the Board's approval of CAMRC's recommendations for the Communications Arts 1 book list, Barkmeier testified:

Q:  So — But what the Board, in essence, sets up here is procedures under the rule and under the handbook that review committees like CAMRC are supposed to follow as they formulate the recommendations to the Board, correct?

A:  Correct. . . .

Q:  And then CAMRC comes to the full Board on April 23, 2012, to see if you'll adopt the recommendations at the suggestion of the committee, right?

A:  Correct.

Q:  And you voted to adopt the recommendations of CAMRC as the new educational materials for the district, right?

A:  We did . . . . As a Board.

Q:  And all of that process is the process set forth in rules 361 or 361.1 and the ACI Handbook, right?

A:  Right.

¶15 In short, every school official involved in the process (including the Board, the Superintendent, and Steinhilber and Bunnow) understood CAMRC to have been extant

11

pursuant to the authority of Rule 361 and the Handbook as approved by the Board, for the purpose of performing the delegated functions of reviewing curriculum materials and presenting them for Board approval.

## D. Procedural History

¶16 Although it was Krueger's request that spurred District officials to form CAMRC pursuant to a modified version of the Handbook process to review the Communications Arts 1 book list, the District did not permit Krueger to attend CAMRC meetings. He asked to attend, but the District denied his request and informed him that CAMRC meetings were not open to the public. The District took the position that the open meetings law did not apply to CAMRC.

¶17 On July 29, 2013, Krueger filed a complaint in Outagamie County circuit court, alleging violations of the open meetings law.[11] The Board and CAMRC moved for summary judgment, and the circuit court granted their motion.

---

[11] A person may not sue to enforce the open meetings law unless the person has first filed a verified complaint with the district attorney. See Journal Times v. City of Racine Bd. of Police and Fire Comm'rs, 2015 WI 56, ¶¶51-52, 362 Wis. 2d 577, 866 N.W.2d 563 (refusing to address an open meetings claim where the procedures for filing suit under the open meetings law were not followed). Only "[i]f the district attorney refuses or otherwise fails to commence an action to enforce this subchapter within 20 days after receiving a verified complaint" may the person "bring an action . . . on his or her relation in the name, and on behalf, of the state." Wis. Stat. § 19.97(4). Here, it is not disputed that Krueger properly filed a verified complaint with the Outagamie County district attorney at least 20 days before commencing this action in the name of the State.

¶18 Krueger appealed, and the court of appeals affirmed. The court of appeals considered it dispositive that CAMRC was created by District officials in response to Krueger's request, rather than by the Board directly. Krueger, unpublished slip op., ¶¶18-21. The court of appeals relied on the fact that Rule 361 did not expressly create CAMRC and that nothing in the Handbook mandated that CAMRC, specifically, be created. See id., ¶7. The court of appeals viewed CAMRC as an ad hoc group of government employees rather than as a governmental body that was subject to the open meetings law.

¶19 Krueger petitioned this court for review, which we granted on October 11, 2016.

## II. STANDARD OF REVIEW

¶20 At issue in this case is whether the lower courts properly interpreted and applied the open meetings law in granting summary judgment to the Board and CAMRC. This is a question of statutory interpretation for our independent review. Journal Times v. City of Racine Bd. of Police and Fire Comm'rs, 2015 WI 56, ¶42, 362 Wis. 2d 577, 866 N.W.2d 563. "When a circuit court's ruling on motions for declaratory judgment depends on questions of law, we review the ruling de novo." Gister v. Am. Family Mut. Ins., 2012 WI 86, ¶8, 342 Wis. 2d 496, 818 N.W.2d 880. We review questions of law "independently of the circuit court and court of appeals but benefiting from their analyses." State v. Popenhagen, 2008 WI 55, ¶32, 309 Wis. 2d 601, 749 N.W.2d 611.

## III. DISCUSSION

13

A. The Definition of a "Governmental Body"

¶21 Wisconsin's open meetings law begins by declaring that "the public is entitled to the fullest and most complete information regarding the affairs of government as is compatible with the conduct of governmental business." Wis. Stat. § 19.81(1). Toward that end, the law requires that every meeting of a "governmental body" be preceded by public notice and kept open to the public, except where a statutory exception authorizes the body to meet in closed session. See generally Wis. Stat. §§ 19.81-19.85.

¶22 Our focus today is on the threshold question of when the open meetings law applies. An entity is subject to the open meetings law if it is a "governmental body" as defined in Wis. Stat. § 19.82(1). The statute provides, in relevant part, that "'[g]overnmental body' means a state or local agency, board, commission, committee, council, department or public body corporate and politic created by constitution, statute, ordinance, rule or order . . . or a formally constituted subunit of any of the foregoing . . . ." § 19.82(1).[12]

---

[12] The rest of the definition, which we need not address in this case, provides that "governmental body" also includes "a governmental or quasi-governmental corporation except for the Bradley center sports and entertainment corporation; a local exposition district under subch. II of ch. 229; [or] a long-term care district under s. 46.2895." Wis. Stat. § 19.82(1). It also "excludes any such body or committee or subunit of such body which is formed for or meeting for the purpose of collective bargaining under subch. I, IV, or V of ch. 111." Id.

(continued)

14

¶23 This definition imposes certain requirements, including the requirement that the entity must take one of seven forms: a "state or local agency, board, commission, committee, council, department or public body corporate and politic." Wis. Stat. § 19.82(1). The adjectives "state or local" modify each item on this list,[13] indicating that the entity must be a part of either state or local government. The entity must also be "created by constitution, statute, ordinance, rule or order." Id. Taken together, these provisions define a "governmental body" not by the purpose behind its formation or by the subject matter of its meetings, but simply by two criteria: (1) the form it takes and (2) the source of its existence in a constitution, statute, ordinance, rule, or order.

¶24 First, a governmental body must take the form of a "state or local agency, board, commission, committee, council, department or public body corporate and politic." Wis. Stat.

---

We also note that some entities that fit the statutory definition nevertheless may be exempt from the open meetings law for constitutional reasons. See State ex rel. Lynch v. Dancey, 71 Wis. 2d 287, 295-96, 238 N.W.2d 81 (1976) (holding that the supreme court's superintending authority over the judicial system preempted the application of the open meetings law to a body created by and under the authority of the court).

[13] "In the absence of some other indication, the modifier reaches the entire enumeration." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 147 (2012) (citing Ward Gen. Ins. Servs. v. Employers Fire Ins., 7 Cal. Rptr. 3d 844, 849 (Ct. App. 2003) ("Most readers expect the first adjective in a series of nouns or phrases to modify each noun or phrase in the following series unless another adjective appears.")).

§ 19.82(1). We gain additional insight into what this requires from other parts of the open meetings law. In particular, we note that a "meeting" of a governmental body is defined as "the convening of members of a governmental body for the purpose of exercising the responsibilities, authority, power or duties delegated to or vested in the body." § 19.82(2). This implies that a governmental body must have a defined membership, because without clarity as to who is and who is not a member, it could be impossible to determine when a sufficient number of members is assembled to constitute a "meeting" of the body. See State ex rel. Newspapers, Inc. v. Showers, 135 Wis. 2d 77, 102, 398 N.W.2d 154 (1987) (holding that a meeting of a governmental body does not occur unless "the number of members present [is] sufficient to determine the parent body's course of action"). Further, the statutory definition of "meeting" states that particular responsibilities, authority, power or duties must be delegated to or vested in the body, as distinct from the members individually. Wis. Stat. § 19.82(2); see State ex rel. Lynch v. Conta, 71 Wis. 2d 662, 681, 239 N.W.2d 313 (1976) (noting that a necessary characteristic of a governmental body is that "collective power" has been conferred upon it).

¶25 Second, the governmental body must be "created by constitution, statute, ordinance, rule or order." Wis. Stat. § 19.82(1). In the general sense of the word, to "create" means to "cause to exist; bring into being." Create, American Heritage Dictionary 438 (3d ed. 1992). In light of this definition, there must be a constitutional provision, statute,

16

ordinance, rule, or order that caused a governmental body to exist where none existed before. In order to cause a body to exist, the relevant directive must confer upon it the collective "responsibilities, authority, power or duties" that are necessary to a governmental body's existence under the open meetings law. See 78 Wis. Op. Att'y Gen. 67, 69 (1989) (OAG 13-89) ("The board would, therefore, be creating a committee by order whenever it authorizes the committee and assigns the duties and functions of the committee.").[14]

¶26 For these reasons, the creation of a governmental body is not triggered merely by "any deliberate meetings involving governmental business between two or more officials." Showers, 135 Wis. 2d at 98. Loosely organized, ad hoc gatherings of government employees, without more, do not constitute governmental bodies. See 57 Wis. Op. Atty. Gen. 213, 216 (1968) (explaining that "meetings between the [] head of a department and . . . the entire staff of a department" were not covered by the former version of the open meetings law "because the staff does not constitute a body"). Rather, an entity must exist that

---

[14] "The opinions of the Attorney General are not binding on the courts but may be given persuasive effect." Milwaukee Journal Sentinel v. City of Milwaukee, 2012 WI 65, ¶41, 341 Wis. 2d 607, 815 N.W.2d 367. Opinions of the Attorney General interpreting the public records and open meetings laws have "special significance . . . inasmuch as the legislature has specifically authorized the Attorney General to advise any person about the applicability of the Law." Id.; see Wis. Stat. § 19.98 ("Any person may request advice from the attorney general as to the applicability of this subchapter under any circumstances.")

17

has the power to take collective action that the members could not take individually. See id. at 218 (concluding that the faculty of a state university was a body covered by the former version of the open meetings law, in part because, under the "faculty handbook, constitution and bylaws, . . . the structure of that faculty body does indeed provide for the taking of formal actions, as a body, with regard to delegated policy-making and administrative functions.") As this court has succinctly put it, "the question of whether a particular group of members of the government actually compose a governmental body is answered affirmatively only if there is a 'constitution, statute, ordinance, rule or order' conferring collective power and defining when it exists." Conta, 71 Wis. 2d at 681.

### B. CAMRC Was a "Governmental Body"

¶27 Applying these principles, we conclude that CAMRC was a committee created by rule under Wis. Stat. § 19.82(1). First, it qualifies as a "committee" for purposes of the open meetings law because it had a defined membership of 17 individuals upon whom was conferred the authority, as a body, to review and select recommended educational materials for the Board's approval. This authority to prepare formal curriculum recommendations for Board approval was not exercised by teachers and curriculum specialists on their own. The Board——acting through Rule 361 and the Handbook——provided that the members of review committees would exercise such authority collectively, as a body. Second, CAMRC was created by rule because District employees, when they formed CAMRC, relied on the authority to

18

form review committees that was delegated to them by Rule 361 and the Handbook.

### 1.   CAMRC Was a "Committee"

¶28 The parties appear to agree that CAMRC took the form of a "committee" for purposes of the open meetings law, and they focus their dispute instead on the second part of the definition. But we are not bound by the parties' concessions. See State v. Hunt, 2014 WI 102, ¶42 n.11, 360 Wis. 2d 576, 851 N.W.2d 434. We therefore briefly explain why we agree that CAMRC was a "committee" under Wis. Stat. § 19.82(1).

¶29 First, CAMRC was formed as a collective entity with a defined membership of 17 particular individuals. Although these individuals volunteered, and Bunnow suggested that more would have been welcome to join, the 17 nevertheless constituted a defined membership selected pursuant to the procedures set forth in the Handbook. Bunnow testified that all 17 members were present and voting at all CAMRC meetings, except for a final meeting which Bunnow characterized as merely a "subcommittee" meeting.

¶30 Nor was CAMRC simply a loosely organized, ad hoc gathering of employees meeting to share knowledge or to facilitate their existing job duties. As members of CAMRC, the 17 teachers, curriculum specialists, and others were meeting to fulfill a collective responsibility that Rule 361 and the Handbook had assigned to review committees, namely, the responsibility to review the book list for the Communications Arts 1 course and to recommend revisions to that book list to

19

the Board for formal approval. The Board-approved Handbook vested review committees such as CAMRC with the power to "identify possible materials/resources" and ultimately "make[] the selection" of which materials or resources should be recommended to the Board. None of the teachers or curriculum specialists on CAMRC would have had this authority individually, but as members of CAMRC, they were empowered to vote on how CAMRC should exercise its collective authority as a body.

¶31 That CAMRC called itself a "committee," kept minutes, and recorded attendance and votes are informative, but not dispositive, facts. The essential elements of the form that an entity must take in order to be a governmental body are (1) a defined membership and (2) collective responsibilities, authority, power, and duties vested in the body as a whole, distinct from the individual members. CAMRC met both of these elements, and therefore we have no difficulty concluding that it was a "committee" under the definition in Wis. Stat. § 19.82(1).

### 2. CAMRC Was Created By Rule

¶32 We conclude that CAMRC was created by rule, because Rule 361 and the Handbook together constituted a "rule" under Wis. Stat. § 19.82(1) that authorized CAMRC to exist and conferred collective authority on it.

¶33 The open meetings law does not define the term "rule," so we look to its common usage. "Statutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." State ex rel. Kalal

20

_v. Cir. Ct. for Dane Cty._, 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110.  The common definition of a "rule" includes "[a]n authoritative, prescribed direction for conduct, especially one of the regulations governing procedure in a legislative body." _Rule_, _American Heritage Dictionary_ 1577 (3d ed. 1992).[15]  We see no indication in the open meetings law that "rule" should be given a peculiar technical meaning instead of being "liberally construed" along with the rest of the open meetings law.  _See_ Wis. Stat. § 19.81(4).  Therefore, for purposes of the open meetings law, we conclude that a "rule" includes any authoritative, prescribed direction for conduct, such as the regulations governing procedure in a governmental body.[16]

¶34  Here, Rule 361 and the Handbook constituted a "rule" because they were adopted by the Board to prescribe the procedures for District employees to follow in reviewing educational materials and presenting them to the Board for

---

[15] "Resort to definitions, statutory or dictionary, is appropriate for the purpose of determining meaning that is plain on the face of the statute."  _State ex rel. Girouard v. Cir. Ct. for Jackson Cty._, 155 Wis. 2d 148, 156, 454 N.W.2d 792 (1990).

[16] Our recognition that the term "rule" in Wis. Stat. § 19.82(1) should be given a common, ordinary, and accepted meaning is not inconsistent with the Attorney General's interpretation of the term "order" in § 19.82(1), which also is derived from a common dictionary definition.  _See_ 78 Wis. Op. Att'y Gen. 67, 68-69 (1989) (OAG 13-89) (defining "order" to include "an authoritative mandate usu[ally] from a superior to a subordinate" and explaining that "[n]either the statute nor the dictionary definition require that the order be formal.  All that is required to create a governmental body is a directive creating the body and assigning it duties.")

approval. Specifically, Rule 361 provided that "[t]he selection of educational materials is delegated to the professionally trained and certified personnel employed by the school system" and that the Board-approved "Handbook delineates the processes leading to Board approval for curriculum revision, adoption of new courses, and implementation of curriculum materials." The processes set forth in the Handbook specifically provided for the creation of review committees for this purpose. As the Board and CAMRC stated in their discovery responses, "Review committees are tasked with duties such as reviewing existing curriculum, reviewing possible materials/resources to support the curriculum, and writing course and program curriculum." Ultimately, "the curriculum recommendations are presented to the Board of Education for approval."

¶35 Therefore, Rule 361 and the Handbook authorized CAMRC to exist and conferred on it the collective authority to review curriculum materials and make a recommendation to the Board. Steinhilber and Bunnow simply put the Handbook process into action when they formed CAMRC to review the book list for Communications Arts 1. As Bunnow testified, "[w]e used the process that was in place through [Rule 361] in the Handbook in a modified process." Although Bunnow and Steinhilber modified the Handbook process somewhat, in that CAMRC reviewed only the book list "because the concern that was brought forth was related to the materials," Steinhilber agreed that CAMRC was a review committee operating under the Handbook, and Bunnow

22

similarly agreed that Rule 361 and the Handbook provided the sole authority for CAMRC to exist.

¶36 Underscoring the nature of the rule under which CAMRC was formed is the fact that, after forming CAMRC, Bunnow went before the Board to explain how the Handbook procedures had been modified to create CAMRC. The Board had a chance to ask questions, and it permitted CAMRC to continue. Barkmeier, a member of the Board, testified that she understood CAMRC to be "part of the curriculum and materials review process." Bunnow testified that CAMRC "finished up the process as designed" when it ultimately presented its recommended book list to the Board for approval, and this "process was authorized through [Rule 361] and the ACI Handbook."

¶37 Accordingly, we conclude that CAMRC was created by Rule 361 and the Handbook, because even though it was Steinhilber and Bunnow who put the Handbook process into action when they formed CAMRC, it was the Board's Rule 361 and the Board-approved Handbook that authorized review committees like CAMRC to be created and conferred on them the collective authority to review curriculum materials and make recommendations to the Board.

¶38 The court of appeals reached the opposite conclusion, reasoning that neither Rule 361 nor the Handbook "created" CAMRC because CAMRC "was not created based on any specific provision of either" Rule 361 or the Handbook. Krueger, unpublished slip op., ¶7. The court found it dispositive that CAMRC was formed not by a directive of the Board but by Steinhilber and Bunnow,

23

acting "on their own initiative" and "borrow[ing] concepts from Board Rule 361.1 and the ACI Handbook." Id., ¶¶7, 21.

¶39 In light of the extensive testimony about how CAMRC was understood to be one of the review committees authorized by the Board through Rule 361 and the Handbook——albeit using a somewhat modified process——we do not find the court of appeals' distinction persuasive. We agree with the Attorney General's opinion that a committee is created whenever a governmental body, by rule, "authorizes the committee and assigns the duties and functions of the committee." See 78 Op. Att'y Gen. 67, 69 (1989) (OAG 13-89). Here, it was the Board's Rule 361 and the Board-approved Handbook——not a directive from Steinhilber or Bunnow——that provided the legal authority for CAMRC to exist and set forth CAMRC's duties and functions. Although the Handbook did not specifically constitute CAMRC by name, it authorized review committees like CAMRC to exist and to exercise the Board's delegated authority over curriculum review. It was that authority that Steinhilber and Bunnow relied on when they formed CAMRC to review the Communications Arts 1 book list.

¶40 For the same reason, the fact that CAMRC did not follow all Handbook procedures to the letter is not dispositive. For example, the Handbook provided for the members of a review committee to include five administrators (one each from a high school and a middle school and three from an elementary school). By contrast, CAMRC included only one high school administrator, and it otherwise consisted of teachers and curriculum support specialists, along with a library media specialist. However,

Bunnow and Steinhilber testified that the Handbook process was adjustable depending on the purpose of the particular review committee, and the membership of review committees often varied. Here, CAMRC was tasked with reviewing the book list for a particular class and making recommendations to the Board, and if it served that goal to have a greater proportion of teachers on the committee, along with a library media specialist, the Handbook did not prohibit such modifications.  In no way did the composition of CAMRC affect its authority to act as a review committee under Rule 361 and the Handbook.

¶41 Krueger also argues, in the alternative, that CAMRC was created by "order" of Steinhilber or Bunnow.  The court of appeals held that this argument was forfeited because it first appeared in Krueger's reply brief.  On appeal, Krueger renews this argument, but we need not resolve it because we hold that CAMRC was created by rule under Rule 361 and the Handbook. Krueger's arguments as to why CAMRC might alternatively have been created by "order" do nothing to disturb our conclusion.

¶42 Finally, the Board and CAMRC argue that subjecting committees like CAMRC to the open meetings law would be detrimental to the functioning of government.  But our task is to apply the open meetings law as it is written.  If the District "seeks change in the statutory provisions [of the open meetings law], it must direct those concerns to the legislature."  Journal Times, 362 Wis. 2d 577, ¶52.  We, however, "presum[e] that the legislature chose its terms carefully and precisely to express its meaning," Ball v. Dist.

25

No. 4, Area Bd. of Vocational, Technical & Adult Educ., 117 Wis. 2d 529, 539, 345 N.W.2d 389 (1984), and we are not at liberty to exempt CAMRC from the definition of "governmental body" simply because government officials would find it convenient. "Mere government inconvenience is obviously no bar to the requirements of the [open meetings] law." Conta, 71 Wis. 2d at 678.

## IV. CONCLUSION

¶43 For all of these reasons, we reverse the decision of the court of appeals and hold that CAMRC was a "state or local . . . committee . . . created by . . . rule" and therefore met the definition of "governmental body" under the open meetings law. See Wis. Stat. § 19.82(1). Where a governmental entity adopts a rule authorizing the formation of committees and conferring on them the power to take collective action, such committees are "created by . . . rule" under § 19.82(1) and the open meetings law applies to them. Here, the Board's Rule 361 provided that the review of educational materials should be done according to the Board-approved Handbook. The Handbook, in turn, authorized the formation of committees with a defined membership and the power to review educational materials and make formal recommendations for Board approval. Because CAMRC was formed as one of these committees, pursuant to the authority delegated from the Board by Rule 361 and the Handbook, it was "created by . . . rule" and therefore was a "governmental body" under § 19.82(1).

*By the Court.*—The decision of the court of appeals is reversed, and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

APPENDIX A

_____

361

## EDUCATIONAL MATERIALS SELECTION

**Responsibilities for the Selection of Educational Materials**
In Wisconsin, it is the role of the local school board to establish written policies, procedures, and rules for the operation of the schools within the district and to adopt textbooks. The school district also has the responsibility to provide adequate materials, texts, and library services which reflect the cultural diversity and pluralistic nature of the American society. In addition, the school district shall not discriminate in the selection and evaluation of instructional and library materials on the basis of sex, race, color, religion, national origin, ancestry, creed, pregnancy, marital or parental status, sexual orientation or physical, mental, emotional or learning disability or handicap. Discrimination complaints shall be processed in accordance with established procedures.

The Board of Education, as the governing body of the School District, is legally responsible for all educational materials utilized within the instructional program of the Appleton Area School District. The selection of educational materials is delegated to the professionally trained and certified personnel employed by the school system. The responsibility for coordinating and maintaining qualitative standards in the selection process rests with the professional staff. Textbooks, however, must be formally adopted by the Board of Education since they constitute the major content of the curriculum.

**Objective of, and Criteria for, the Selection of Educational Materials**
The primary objective of selecting materials is to implement, support, and enrich the educational program of the school system. While specific criteria are developed by the individual curriculum committees and the media department, the general criteria utilized in the selection processes are:

* Materials are selected consistent with the educational goals of the District regarding locally designed standards, State standards, and National standards.

* Materials selections are appropriate for the age, social development, and maturity of students.

* Materials and information shall meet high standards of quality in factual content and presentation.

* Materials and information shall have factual, aesthetic, literary, ethical, or social value.

* Materials and information chosen shall be written/produced by competent and qualified authors and producers.

* Materials and information shall be chosen to foster respect for women and minority and ethnic groups and shall realistically represent our pluralistic society, to foster respect for all groups of people who form our society.

* Physical format and appearance of materials and information shall be suitable for their intended use.

74                                                   August 2009

2164

Exhibit 12

57

361 (cont.)

* Materials are selected on all levels of difficulty with diverse appeal and differing points of view.

* The selection of materials on political theories and ideologies, religion, public issues and on topics considered by some to be controversial, is directed toward maintaining a balance representing various views.

* Materials are judged as a whole taking into account the author's/producer's intent rather than focusing on single words, phrases, pictures, or incidents taken out of context.

## Procedures for Handling Challenged Materials

The option is always open for a parent to object to specific educational materials being used with his/her child as part of the educational program. The parent or guardian has the right to judge whether certain materials are acceptable for his/her child. However, no parent or organization has the right to abridge the rights of other parents or children to have access to materials which are part of the School District's educational program.

Any adult resident or employee of the School District may raise objection to materials used in the educational program. In the event of an objection to the use of a specific educational material, every effort should be made to first resolve the matter at the school or building level. If the school or building process is unsuccessful, the complainant may formally challenge the use of specific materials. This complaint must be in writing, and will be forwarded by the District administration to a materials review committee composed of citizens, professional staff members, and high school students. The task of the committee is to review the material in question and provide a written recommendation to the Superintendent of Schools.

Any review committee recommendation and subsequent decision by the District administration may be appealed to the Board of Education for a final decision.

| Cross References: | Student Discrimination Complaint Procedures, 411.2-Rule |
| | Educational materials Selection, 361-Rule |
| Legal Reference: | Wisconsin State Statutes 118.03, 118.13, 119.18, 120.13, 120.49 |
| | and 121.02 |

Adoption Date:    June 26, 1993
Amended Date:    June 13, 2003

75                                        August 2009        u5ꟷ

2165

bo

2

361-Rule

## EDUCATIONAL MATERIALS SELECTION

### Procedures

I. **Definitions**

Educational materials - the general term used to refer to all print and non-print materials or resources which are used as a part of the educational program of the School District. Throughout this policy, the term "materials" shall be used to mean educational materials.

Textbooks - the book or set of materials which serves as the foundation for more than fifty percent of the content of any Board-approved course. In Wisconsin, textbooks must be formally adopted by the Board of Education.

Supplementary materials - books or other non-print materials used within the context of the instructional program which are not included in the definitions of textbooks or instructional materials listed above. Other resources used by the school system in its educational program such as field trips, resource persons, speakers or dramatic events, are not within the scope of this policy.

LMC materials - those materials that are acquired by and circulated from the Library Media Centers (LMC's) for student or teacher use.

II. **Procedures for Selection of Educational Materials and Textbooks**

Curriculum revision is an ongoing process as defined in the Board approved Appleton Area School District (AASD) Assessment, Curriculum & Instruction Handbook. This Handbook delineates the processes leading to Board approval for curriculum revision, adoption of new courses, and implementation of curriculum materials.

III. **Procedures for Selection of School Library Media Center Materials**

For the purposes of these rules, School Library Media Center is used as a synonym for School Media Center and School Library. School Library Media Specialist is used as a synonym for School Media Specialist or Librarian. The term Materials is used for any materials or information, regardless of format.

- In selecting materials and information for purchase for the school library media center, the school library media specialist will evaluate the existing collection and the curriculum needs, consider the weeding and replacement plans, and consult with reputable, professionally prepared selection aids and other appropriate sources.

- Recommendations for purchase will be solicited from faculty and the student body. Recommendations from parents and community members will also be considered. Such recommendations will be seriously considered but are not binding on the library media specialists.

76                                    August 2009

2166

3

361-Rule (cont.)

- Materials and information offered as gifts shall be evaluated by the criteria in Section II and shall be accepted or rejected by those criteria. Such materials will not be accepted if subject to restrictions on use or disposal or if they would produce an imbalance the library media center cannot afford to redress.

- Selection is an ongoing process. It shall include the removal of materials no longer appropriate and the replacement of lost and worn materials still of educational value. This process shall be guided by the policies and procedures for replacement and weeding.

- Selections shall be forwarded to the designated business or administrative office for purchase throughout the year.

## IV. Procedures for Selection of Supplementary Materials

The use of supplementary materials in the educational program is based on the criteria in this policy, the needs of the curriculum, and the professional judgment of the instructional staff. Whenever a teacher plans to utilize supplementary materials beyond the normal parameters of the curriculum, the matter should be discussed with the building principal or appropriate supervisor/program leader.

## V. Use of Controversial Materials in the Classroom

The option is always open for a parent to object to a specific educational material being used with his/her child as a part of the educational program. The parent or guardian has the right to judge whether certain materials are acceptable for his/her child. However, no parent or organization has a legal right to abridge the rights of other parents or children to have access to materials which are a part of the School District's educational program.

Occasionally, course objectives can be achieved through exposure to materials that may be considered controversial in nature. If in the professional judgment of the teacher, supervisor, or principal such material might be objectionable to a number of parents from the community, a letter must be sent to parents or guardians of students in the course prior to the use of the material(s) in question. The letter shall indicate the titles of the proposed material and offer to substitute alternative materials for any on the list considered objectionable by the parent or legal guardian.

## VI. Procedures for Handling Challenged Materials

A. REVIEW
B. ALTERNATE EDUCATIONAL MATERIALS
C. REQUEST FOR REVIEW
D. REVIEW COMMITTEE
E. REVIEW PROCESS

77                                   August 2009        $\psi \wp^0$

2167

E2

4

A. Review

Any adult resident of the Appleton Area School District (AASD) may raise objection to materials used in the educational program and ask that a specific title or titles be reviewed or reexamined. The term "review" used in this section will refer to reexamination or reevaluation of material based on a complaint resulting in the submission of a completed Request for Reconsideration of Educational Material form. It should not be confused with the normal reviewing process as a part of selection. This will not be considered to reflect adversely on the qualifications of the person or persons who made the selection.

1. The school official or staff member receiving a request for review or reexamination regarding library media center (LMC) or text materials shall explain (or seek assistance in explaining) to the requester the place this material occupies in the educational program, its intended educational usefulness, and additional information regarding its usefulness. The materials shall remain in use unless removed through the formal procedure herein provided.

2. In the event that the person asking for the review is not satisfied with the initial explanation, the person raising the question should be referred to the building principal. Every building has in place a process for the discussion of challenged materials. The complainant shall be apprised of the District's selection policy, criteria for selection, the reason for the selection and the judgment of other outside professionals, such as reviewers, regarding the material. Appropriate district-level personnel should be consulted for their expertise, which may contribute to a resolution of the issue. Upon completion of the building-level process, the complainant shall be informed of the school's decision regarding the material in question. Notification will be in writing and indicate name, material, and resolution within two weeks.

3. If the building decision is unacceptable to either the complainant or any committee member, he/she may formally request an appeal of the use of the material in the educational program following the AASD Challenged Materials review process.

B. Alternate Educational Materials

The option is always open for a parent to object to a specific educational material being used with his/her child as a part of the educational program. The parent or guardian has the right to judge whether certain materials are acceptable for his/her child. However, no parent or organization has a legal right to abridge the right of other parents or children to have access to materials that are a part of the School District's educational program.

Occasionally, course objectives can be achieved through exposure to materials that may be considered controversial in nature. If, in the professional judgment of the teacher, supervisor, or principal, such material might be objectionable to a number of parents from the community, a letter must be sent to parents or guardians of students in the course prior to the use of the material(s) in question. The letter shall indicate the titles of the proposed material and offer to substitute alternative materials for any on the list considered objectionable by the parent or legal guardian.

2168

63

5

C. Request for Review
   1. All formal requests for review must be made on the Request for Reconsideration of Educational Material form. Forms are available through the School District's office, building principal, or library media specialist.

   2. The Request for Reconsideration of Educational Material form must be signed by the person making the request and filed with the District Superintendent.

   3. Within two weeks of the receipt of the formal complaint, the District Superintendent or the Superintendent's designee shall present the formal complaint to the District's materials review committee for re-evaluation. The task of the review committee will be to make a recommendation for disposition of the material in question to the District Superintendent.

D. Review Committee
   1. The Review Committee shall be made up of thirteen members.
      a. One teacher appointed biannually by the Superintendent
      b. Program Leader, Media Services
      c. One principal and one central office administrator appointed biannually by the superintendent
      d. Six members from the community appointed annually by the city-wide PTA
      e. Three high school students (one each from East, West, and North) selected annually by a process determined at each high school, or selected annually from and by the Student Advisory Committee

   *Continuity should be provided in the selection process to ensure the same members are not appointed over and over.*

E. Review Process
   1. At the first meeting following receipt of a Request for Reconsideration of Educational Material form,
      a. The positions of chair and secretary shall be selected. The chair of the committee shall be elected from the six community representatives and the secretary shall be an employee of the District.
      b. The Superintendent or his appointee will prepare and distribute the following:
         • Copies of the written Request for Reconsideration of Educational Material form
         • Copies of the material in question for full review
         • Reputable, professionally prepared reviews of the material if available
         • Appropriate checklist form for fiction or nonfiction material
      c. Discussion and procedures will be finalized as to how the committee will proceed.

   2. At a subsequent meeting, thorough discussion of the material will be conducted. Interested persons, including the person requesting the review, will have the opportunity to share their views. The committee may request individuals with special knowledge to present information to the committee.

79                                          August 2009        446

2169

64

361-Rule (cont.)

3. In the event of multiple challenges, the review committee may appoint a subcommittee of members and/or nonmembers to consolidate challenges and make recommendations to the full committee. The composition of such subcommittees shall approximate the representation of the review committee.

4. The person requesting the review shall be kept informed by the secretary concerning the status of the review through the committee process. All known interested parties shall be given appropriate notice of committee meetings.

5. At a subsequent meeting, the committee shall make its decision in open session to:
   a. Take no removal action.
   b. Remove all or part of the material from the total school environment.
   c. Allow the use of alternate titles, selected by appropriate school personnel.
   d. Limit the educational use of the material.

   *The sole criterion for the final decision is the appropriateness of the material for its intended educational use.*

6. The written decision and its justification shall be forwarded to the Superintendent for appropriate action, to the person initiating the request, and to the appropriate building principal(s).

7. A request to review materials that have previously been before the committee must receive approval of a majority of the committee members before the materials shall be reconsidered. Requests with less than a two-year lapse will not be considered. Every Request for Reconsideration of Educational Material shall receive a written response from the committee.

8. Committee members directly associated with the selection, use, or request for review of materials shall be excused from the committee during the deliberation on such materials. The Superintendent may appoint a temporary replacement for the excused committee member, but such replacement shall be of the same general qualifications of a member excused.

9. If not satisfied with the decision, any person may request that the matter be placed on the agenda of the next regularly scheduled meeting of the Board of Education for a final decision.

10. If the matter reaches the press, the District Superintendent, or designee, will make the response.

Cross References: Curriculum Development and Adoption, 330 and 330-Rule
Testing Programs, 346
Assessment, Curriculum & Instruction Handbook

Legal References: Wisconsin State Statutes 118.03, 118.13, 119.18, 120.13, 120.49 and 121.02
**Adoption Date:** **June 26, 1993**
**Amended Date:** **January 13, 2003**

80                                      August 2009

2170

65



Appleton Area
School District

ASSESSMENT,
CURRICULUM
& INSTRUCTION
HANDBOOK

Revised, August 2009

EXHIBIT
D

2091

67

# AASD 6-Year Curriculum Cycle

## Phase 1:  (P)K-12 Self-Study and Level/Course Planning and Review

The initial phase of the cycle involves a self-study of the program, including achievement data and other data.  The purpose is to recommend a direction for the program in the remaining years of the cycle.
This initial phase of the cycle begins with a (P)K-12 self-study.  If the adoption will be done by level or by course, the planning and review steps are applied to that particular level or course following the (P)K-12 self-study.

I.  **Establish a committee for program review**
   - (P)K-12 Steering Committee makeup:  ACI Director/Coordinator; Administrators from High School (1), Middle School (1) and Elementary School (3); Teachers - High School Curriculum Support Specialists (3), Middle School Curriculum Support Specialists (4), and Elementary School (3); Special Education representative; and as pertinent TAG, Title I and ELL.
   - Send E-mail with attachment to AASD staff containing letters of application for committee membership
   - Screen applicants and select committee members taking into consideration a diversity of opinions and background, veteran as well as new teachers, etc.
   - Committee must include a site administrator.
   - Send letters of acceptance with information regarding first meeting and letters of non-participation to applicants

II.  **Provide information to committee members**
   - National, state, and local standards
   - Research in field regarding pedagogy, best practices, performance indicators, national trends, and local needs
   - Curriculum guides
   - Review of standardized test scores and/or analysis of district-wide assessments
   - Templates for committee work

III.  **Committee Meetings**
   - First Meeting - Provide overview of the process, timeline, and future goals, collect E-mail addresses of participants, set times for future meetings
   - Outline expectations of committee members and process for minutes
   - Articulate process for feedback of the committee's work
   - Analyze data, including data on course enrollment and academic progress based on gender and ethnicity (and SES if available)
   - Identify key questions for additional data collection and analysis
   - Gather data on key questions from appropriate sources (community, students, parents, etc.)
   - Review district program goals, revising if necessary

IV. **Outcome**
   - Written analysis of review of program (see template)
   - Written recommendations to provide direction for next stage of the cycle
   - Item of information to the Board of Education if significant changes are recommended

# AASD 6-Year Curriculum Cycle

# Phase 2: Revision and Materials Selection

Using information and recommendations from Phase One, committees will revise the curriculum, write/identify district-wide standards based assessments, select resources for the delivery of the curriculum, and recommend staff development.

I.  **Review Existing Curriculum**
    - ☐ Establish a representative committee of teachers, administrators and department staff (include representation from special populations to the extent possible)
    - ☐ Establish committee chairs
    - ☐ Review existing curriculum (course objectives, performance indicators and classroom assessments) for alignment with state and local standards
    - ☐ Include recommendations from the (P)K-12 Self-Study Planning and Review committee work in revision process
    - ☐ Make preliminary changes to the curriculum document following the established format (page 22)
    - ☐ Determine process for writing and disseminating meeting summaries. All teachers at a level or department should receive regular meeting updates.

II. **Review Possible Materials/Resources to Support the Curriculum**
    - ☐ With the same committee, identify possible materials/resources
    - ☐ Committee Chair will request sample copies and request the company to do an alignment of their product to the AASD standards
    - ☐ Committee develops an evaluation instrument using established AASD criteria (see appendix) and content specific requirements
    - ☐ Using the criteria, narrow the choices to two to three vendors who will be asked to do presentations to the committee and a separate presentation to teachers
    - ☐ Make materials available for preview to teachers
    - ☐ Systematically collect feedback and information from teachers and site administrators regarding the choices
    - ☐ Share feedback with the committee; committee makes the selection
    - ☐ Identify texts/materials and any other resources needed by special populations (EEN, ELL, TAG)
    - ☐ Utilize Materials Preview Checklists and checklist for K-12 Materials Selection for Special Populations (page 17)

III. **Curriculum Writing**
    - ☐ Identify texts/materials and any other resource costs (include resource needs of special populations).
    - ☐ Revise curriculum with broad representation throughout the District (TAG/Special Education/ELL involvement)—there must be representation from site administration
    - ☐ Use the template format (page 22)
    - ☐ Identify Essential Learning Objectives
    - ☐ Specifically identify how reading and writing standards will be addressed in each course
    - ☐ Identify or develop the district-wide assessments to benchmark the major standards (and upload into Eclipse)
    - ☐ Provide curriculum to department, administrators and ACI department for feedback

□ Make any needed adjustments
□ Suggest implementation strategies for the following school year
□ Curriculum documents reviewed by content steering committee by February

## IV. BOE Approval Process

□ Include topic on ACI agenda before the information is disseminated for Program and Services
□ **By the end of the calendar year,** for budgeting purposes, Item for Consideration is presented to Program and Services (from Curriculum Coordinator/Director to Assistant Superintendent)
□ Item for Consideration packet includes revised curriculum and list of resources being adopted
□ Resources on display second floor of Morgan for public viewing (thirty days before Item is taken to full Board of Education)
□ Determine if charter schools will be using materials or budget an equal allocation
□ Determine number of textbooks to be purchased by looking at largest class in lower grades (for required classes). Order 10% more of required course texts to accommodate future losses and/or wear
□ Purchase orders completed with Materials/Resource Distribution form (see appendix) by July 1st (new fiscal year). Be sure to write on PO: "Please bill after July 1."
□ Transfer per pupil monies to charter schools if they are not getting the adopted texts and materials
□ Provide manuals and as much support material possible to teachers before the summer break
□ Post BOE approved curriculum on the web site and on the K drive



11         August 2009

7ᢂ

¶44 SHIRLEY S. ABRAHAMSON, J. *(concurring)*. The instant case traverses the Open Meetings Law and public education. The Open Meetings Law[1] reflects Wisconsin's deep commitment to open and transparent government.[2] Education is a key constitutional function of Wisconsin government. Wis. Const. Art. X.

¶45 Our democratic system of government——as well as the well-being of each person in this state and the sound functioning of our economic system——depends on a well-educated population. "Wisconsin students have a fundamental right to an equal opportunity for a sound basic education. An equal opportunity for a sound basic education is one that will equip students for their roles as citizens and enable them to succeed economically and personally." Vincent v. Voight, 2000 WI 93, ¶3, 236 Wis. 2d 588, 614 N.W.2d 388.

¶46 Parental and public involvement in education is, in my opinion, indispensable, and is legislatively protected by the Open Meetings Law. It is not, however, in the parents' or public's interest to make every collaborative decision made by

---

[1] See generally Wisconsin Statutes Chapter 19, Subchapter V entitled Open Meetings of Governmental Bodies, Wis. Stat. §§ 19.81-98.

[2] State v. Beaver Dam Area Dev. Corp., 2008 WI 90, ¶2, 312 Wis. 2d 84, 752 N.W.2d 295.

educators subject to the strictures of the Open Meetings Law.[3] The application of the Open Meetings Law to education (or any other government function) is not without limits.

¶47 The legislative declaration of policy in the Open Meetings Law states in full as follows:

> In recognition of the fact that a representative government of the American type is dependent upon an informed electorate, it is declared to be the policy of this state that the public is entitled to the fullest and most complete information regarding the affairs of government as is compatible with the conduct of governmental business.

Wis. Stat. § 19.81(1) (emphasis added).[4]

¶48 Indeed the Open Meetings Law conveys limits.  The legislature intended the Law to be construed liberally but not so that it impedes the functioning of government.  On the one hand, the legislature's declaration of policy explicitly states: The policy of the state is that the public have the fullest and most complete information regarding the affairs of government.  On the other hand, the legislature's declaration of policy also proclaims a countervailing concern and limitation:  The Open

---

[3] "Even though Wisconsin courts have not specifically addressed this issue, the extensive federal case law in this area establishes that parents simply do not have a constitutional right to control each and every aspect of their children's education and oust the state's authority over that subject."  Larson v. Burmaster, 2006 WI App 142, ¶39, 295 Wis. 2d 333, 720 N.W.2d 134.

[4] See also Wis. Stat. § 19.31 (providing that the policy of the public records law is to ensure that the public has access to "the greatest possible information regarding the affairs of government and the official acts of those . . . who represent them.") (emphasis added).

Meetings Law prevails "as is compatible with the conduct of governmental business."

¶49 Both aspects of the legislative policy statement should guide this court's interpretation and application of the Open Meetings Law in the instant case. Government operations should be open and transparent to the fullest extent possible. But, the Open Meetings Law should not be interpreted to apply to every meeting between administrators and employees and others to discuss how to implement specific policies or programs or how to do their day-to-day jobs. These kinds of meetings take place routinely, and as the Department of Justice has advised: "They cannot be made subject to the open meetings law because to do so would make it impossible to carry out the day-to-day business of government."[5]

¶50 To distinguish between these two kinds of meetings under the Open Meetings Law is the difficult issue presented.

¶51 The importance of this case to the public and to school officers and employees for the transparent and effective

---

[5] Letter from Assistant Attorney General Mary Woolsey Schlaefer to Jim Pepelnjak of the Milwaukee Journal Sentinel Inc. (June 8, 1998). See also Wisconsin Department of Justice's Wisconsin Open Meetings Law Compliance Guide 7 (Nov. 2015) ("The definition of a 'governmental body' is only rarely satisfied when groups of a governmental unit's employees gather on a subject within the unit's jurisdiction."); Letter from Assistant Attorney General Thomas C. Bellavia to Joe Tylka (June 8, 2005) (the Open Meetings Law does not apply to "meetings of groups of government officials and employees that are not established pursuant to some such informal directive, but that simply meet together on an ad hoc basis in the interest of governmental efficiency . . . .)".

operations of a school system is evident from the numerous briefs the court has received from many stakeholders:

- The parent (John Krueger) has submitted briefs;
- The Appleton Area School District Board of Education and Communication Arts 1 Materials Review Committee have jointly submitted a brief;
- The Wisconsin Department of Justice has submitted a non-party amicus brief;[6]
- The Wisconsin Freedom of Information Council, the Wisconsin Newspaper Association, and the Wisconsin Broadcasters Association have jointly submitted a non-party amicus brief; and
- The Wisconsin Counties Association, the League of Wisconsin Municipalities, the Wisconsin Association of School Business Officials, the Wisconsin Association of School Personnel Administrators, the Wisconsin Association of School Boards, the Wisconsin Council for Administrative Services, the Association of Wisconsin School Administrators, and the Wisconsin Association of School District Administrators have jointly submitted a non-party amicus brief.

¶52 All the briefs, including the Department of Justice's brief, agree that this court's guidance is needed to develop the

---

[6] The Department of Justice's brief did not focus on the facts of the instant case. The Department of Justice did not support either John Krueger or the School Board regarding the application of the Open Meetings Law to the instant case.

definition of "governmental body" in the Open Meetings Law. They agree that more clarity is needed than is currently provided by the Department of Justice's formal and informal communications. Clarity is needed because government functions best when it has clearly defined and uniformly applicable standards.

¶53 The briefs are, however, far from agreement as to what the court's guidance should be, even when they agree on the bottom line, that is, even when they agree whether CAMRC is or is not a governmental body subject to the Open Meetings Law.[7] (I shall refer to CAMRC as the Review Committee.)

¶54 I focus, as the majority opinion and briefs do, on the word "create" in Wis. Stat. § 19.82(1) as the significant word in the instant case in determining whether the Review Committee fits within the definition of "governmental body" in the Open Meetings Law. The definition of "governmental body" is important because the Open Meetings Law applies to every meeting of a governmental body. Wis. Stat. § 19.83(1). "Governmental body" is defined in § 19.82(1) as follows:

> (1) "Governmental body" means a state or local agency, board, commission, committee, council, department or public body corporate and politic <u>created</u> by constitution, statute, ordinance, rule or order . . . . (Emphasis added.)

¶55 Whether the Review Committee is a governmental body subject to the Open Meetings Law is a close call for me.

---

[7] "CAMRC" is used by the majority opinion. CAMRC refers to the Communication Arts 1 Materials Review Committee.

5

Indeed, at oral argument John Krueger's counsel often stated in response to questions from the court posing hypotheticals: "Line drawing is very difficult."

¶56 I am not persuaded by the parent's arguments that a rule or order created the Review Committee. The best that can be said for the parent's position is that the "creation" in the instant case may be hazy.

¶57 The Department of Justice's <u>Wisconsin Open Meetings Law Compliance Guide</u> (Nov. 2015) at 6 recommends that "[a]ny doubts as to the applicability of the open meetings law should be resolved in favor of complying with the law's requirements." I do not necessarily agree with this recommendation. It fails to recognize the legislature's countervailing interests of transparency and effective government operations. Furthermore, the parent in the instant case had access to the work of the Review Committee through his open records requests, and he had the opportunity to make his suggestions heard by the Review Committee.

¶58 Moreover, and significantly, an important issue at this stage of the instant case is not merely the label pinned on the Review Committee but rather the next step should the majority opinion declare that the Review Committee was a governmental body subject to the Open Meetings Law. The parent's brief does not request that the acts of the Review Committee be voided under Wis. Stat. § 19.97(3).

¶59 I do not join the majority opinion for several reasons.

6

¶60 First, the majority opinion gives short shrift to Wis. Stat. § 19.81(1), the legislative policy requiring transparent government "as is compatible with the conduct of governmental business." The majority opinion seems to read this aspect of the legislative policy statement out of the Open Meetings Law, or at the least gives it little or no weight in interpreting the Open Meetings Law. Majority op., ¶42.

¶61 Yet a court looks at a statement of legislative policy as an intrinsic guide to meaning. Schilling v. Crime Victim Rights Bd., 2005 WI 17, ¶14, 278 Wis. 2d 216, 692 N.W.2d 623; Wisconsin's Environmental Decade, Inc. v. P.S.C., 69 Wis. 2d 1, 18, 230 N.W.2d 243 (1975); Letter from Assistant Attorney General Mary Woolsey Schlaefer to Jim Pepelnjak of the Milwaukee Journal Sentinel Inc. (June 8, 1998); Wisconsin Bill Drafting Manual 2017-2018, 7.02.

¶62 Second, I disagree with the majority opinion's conclusion at ¶33 that the word "rule" in Wis. Stat. § 19.82(1) should be given the dictionary definition that appears in the 1992 version of the American Heritage Dictionary. According to the majority opinion, the definition of "'rule' includes "an authoritative, prescribed direction for conduct, especially one

of the regulations governing procedure in a legislative body." Majority op., ¶33.[8]

¶63 The statute, Wis. Stat. § 19.82(1), defines "governmental body," inter alia, as a "committee" that is "<u>created</u> by constitution, statute, ordinance, rule or order."[9] Each of the words in the list beginning with the word "constitution" is used in common parlance, but each is used in the statute in a technical, legal sense. Each describes a written, formal document enacted as required by law. Why would the legislature switch in midsentence and not use the words "rule or order" in their technical, legal sense? Applying a generally accepted canon of statutory interpretation, I conclude that the legislature did not make a switch in midsentence.

---

[8] A single word can have multiple definitions. The American Heritage Dictionary provides well over a dozen formulations of a definition for the word "rule." Likewise, the online version of the Merriam-Webster Dictionary defines "rule" in over a dozen ways. By choosing one definition from the American Heritage Dictionary without explaining why that definition applies, the majority opinion overlooks a court's directive in statutory interpretation: "Many words have multiple dictionary definitions; the applicable definition depends upon the context in which the word is used." <u>State ex rel. Kalal v. Circuit Court for Dane County</u>, 2004 WI 58, ¶49, 271 Wis. 2d 633, 681 N.W.2d 110. <u>See also</u> <u>Noffke ex rel. Swenson v. Bakke</u>, 2009 WI 10, ¶60, 315 Wis. 2d 350, 383, 760 N.W.2d 156 (Abrahamson, C.J., concurring) ("Dictionaries usually furnish more than one meaning to a word, and a court has to be careful not to select a friendly definition it likes from the many offered without explaining its choice.").

[9] The Open Meetings Law applies to a "governmental body," which is defined as "a state or local agency, board, commission, committee, council, department or public body corporate and politic <u>created by</u> constitution, statute, ordinance, rule or order . . . ." Wis. Stat. § 19.82(1) (emphasis added).

8

¶64 The applicable canon of statutory interpretation is known by the Latin phrase "noscitur a sociis." Translated, the phrase means "it is known by its associates." In other words, the meaning of each word in the string of words of "constitution, statute, ordinance, rule or order" may be known from the words accompanying it.[10]

¶65 The words "constitution," "statute," and "ordinance" describe formal, written documents adopted in accordance with requirements set forth in law.

¶66 The Wisconsin Department of Justice's Wisconsin Open Meetings Law Compliance Guide (Nov. 2015) at 2 corroborates that the words "constitution," "statute," and "ordinance" refer to legal documents under Wisconsin law, stating:

> The words "constitution," "statute," and "ordinance," as used in the definition of "governmental body" refer to the constitution and statutes of the State of Wisconsin and to ordinances promulgated by a political subdivision of the state.[11]

---

[10] Although rules of interpretation serve the court, they are not absolute rulers of a court's interpretation. Boardman v. State, 203 Wis. 173, 176, 233 N.W. 556 (1930) (quoting Benson v. Chicago, St. P., M. & O. Ry. Co., 77 N.W. 798, 799 (Minn. 1899)).

[11] The word "ordinance" appears more than 300 times in the Wisconsin Statutes. See, e.g., Wis. Stat. § 61.50 relating to ordinances by villages, and § 62.11 relating to ordinances by cities.

The court defined "ordinances" as follows in Wisconsin Carry, Inc. v. City of Madison, 2017 WI 19, ¶25, 373 Wis. 2d 543, 892 N.W.2d 233: "[O]rdinances are municipal legislative devices, formally enacted, that address general subjects in a permanent fashion."

9

¶67 The words "rule" and "order" can be interpreted in a number of ways. Indeed the briefs offer several alternatives.[12]

---

[12] Some briefs treat "rule or order" as one-and-the same; other briefs address "order" more specifically. The brief of the Department of Justice addresses only the word "order."

The parent's brief explains that a "rule or order" may include "any directive, formal or informal, creating a body and assigning it duties" that "come[s] from governmental bodies, presiding officers of governmental bodies, or certain government officials, such as county executives, mayors, or heads of a state or local agency, department or division" (that is, "a hierarchical top-down creation of a group"), but only if "the possibility exists that the real decision-making will happen at the committee meetings and be rubber-stamped by the governing board." Plaintiff-Appellant-Petitioner's Brief and Appendix at 19-20 (internal citations and quotations omitted).

The School Board's brief seems to agree that a "rule" may be formal or informal, but asserts that the creation must be done through an "explicit delegation of authority." Defendant-Respondents' Brief at 19.

The brief of the Wisconsin Freedom of Information Council explains that the "[t]he terms 'rule or order' as used in Section 19.82 have been broadly construed to include any directive, formal or informal, that creates a body and assigns it duties." The Council clarifies that this definition means that "the committee need only have come into being through the agency, participation, or authority of the [rule or order]." Non-Party Brief and Appendix of the Wisconsin Freedom of Information Council et al. at 5, 8.

The Wisconsin Counties Association argues in its brief that the Attorney General's interpretation of "rule or order" that includes informal directives is misplaced and that "the Court should hold that a 'rule or order' is a directive adopted or issued by an existing governmental body in the normal manner by which it does its work. In all [sic] most, if not all, situations this will be adoption by a majority vote. And, such formal directives will be recorded in the minutes of the governmental body." Non-party Brief of Wisconsin Counties Association et al. at 11-12.

¶68 It seems most reasonable to me to conclude that the legislature would use the words in this string uniformly in their legal meaning in Wisconsin law.[13]

¶69 The majority opinion disagrees. The majority opinion's analysis of the word "rule," as well as its refusal to consider the legislative policy section (see ¶¶47-48, 60-61, supra) in interpreting the Open Meetings Law, is at odds with the analysis this same majority of justices recently set forth in Wisconsin Carry, Inc. v. City of Madison, 2017 WI 19, ¶¶19-20, 373 Wis. 2d 543, 892 N.W.2d 233. In Wisconsin Carry, the majority stated: "We are not merely arbiters of word choice. . . . We find [plain] meaning in the statute's text, context, and structure . . . ."

¶70 I recognize that the Department of Justice has, without reference to the canon of noscitur a sociis or any other authority or rationale, interpreted the phrase "rule or order" in accordance with common and approved usage and as including "any directive, formal or informal, creating a body and assigning it duties."[14] Unfortunately, the Department's

---

[13] The word "rule" for purposes of state government is defined in Wis. Stat. § 227.01(13) (including 72 exceptions). I could find no definition of "rule" regarding local governmental entities, but the word "rule" is used in the statutes too many times to count relating to rulemaking by local governmental entities.

[14] Wisconsin Department of Justice's Wisconsin Open Meetings Law Compliance Guide (Nov. 2015) at 2. See also Letter from Assistant Attorney General Thomas C. Bellavia to Joe Tylka (June 8, 2005).

(continued)

11

interpretation of the word "rule" does not, as is demonstrated in the briefs, provide sufficient clarity and guidance.

¶71 Why would the legislature require anything less for a "rule or order" than a formal written document promulgated by an appropriate entity? The Department of Justice has an answer that should be considered but it is not totally satisfactory. The Department of Justice is concerned that requiring a formal document would allow an entity to evade the Open Meetings Law by adopting informal processes. The Department of Justice explains:

> If a formal order were required, the open meetings law might be evaded by the creation of "informal" bodies. Therefore, the interpretation that the open meetings law does not require that the order be formal is consistent with the statement by the Florida Supreme Court that the sunshine law "should be construed so as to frustrate all evasive devices."

78 Wis. Op. Atty. Gen. 67, 69 (quoting Wood v. Marston, 442 So. 2d 934, 940 (Fla. 1983)).

¶72 I strongly agree with the Department of Justice that the consequences of an interpretation matter, and a consequence like evasion of the Open Meetings Law should be considered and

---

No entity on the list of state or local bodies created by resolution, rule, or order in the Wisconsin Department of Justice's Wisconsin Open Meetings Law Compliance Guide (Nov. 2015) at 3 seems to me to resemble the Review Committee in the instant case.

12

prevented.[15]   But in an attempt to prevent evasion, the Department of Justice's definition of "rule or order" raises two basic, serious problems:   The Department's definition is not tethered to the text and context in which the words are used in the Open Meetings Law and does not provide sufficient clarity or guidance.   There should be other ways to prevent evasion.

¶73  When I look at the text and context in which the words "rule or order" are used, I conclude, in contrast to the majority opinion, that the word "rule" is not defined by the 1992 version of the American Heritage Dictionary.   The words "rule or order" derive their meaning from Wisconsin law, not the dictionary.

¶74  The third reason I disagree with the majority opinion is that it concludes, majority op., ¶¶33-35, that Rule 361 and the Handbook, taken together, created the Review Committee.   I agree with the court of appeals that the Review Committee was not created by Rule 361, the Handbook, or any other rule.[16]

---

[15] Consequences are an important consideration in interpreting a statute.   See, e.g., Wisconsin Carry, 373 Wis. 2d 543, ¶20 (if an interpretation results in "unreasonable or absurd" consequences, that interpretation may be rejected); Anderson v. Aul, 2015 WI 19, ¶114, 361 Wis. 2d 63, 862 N.W.2d 304 (Ziegler, J., concurring) (asserting that the plain meaning analysis includes consideration of consequences of alternative interpretations to avoid unreasonable results).

[16] "Krueger is unable to direct us to any provision of either authority under which the Review Committee was created." State ex rel. Krueger v. Appleton Area Sch. Dist. Bd. of Ed., No. 2015AP231, unpublished slip op. at ¶18 (Wis. Ct. App. June 28, 2016).

¶75 Here is how the Review Committee came into existence. A parent requested Superintendent Allinger to create a new and alternative course. Superintendent Allinger then told the District's Assessment, Curriculum and Instruction (ACI) Department to handle the parent's request. The ACI Department head, Kevin Steinhilber, and his immediate subordinate, Nanette Bunnow, created the Review Committee to address the parent's request.

¶76 Steinhilber and Bunnow decided that the Review Committee they created would consider the option of creating an alternative course in response to the parent's request, conduct an evaluation of the curriculum materials for the Communication Arts I course to see if different materials could resolve the parent's concerns, and review the course materials because a Communication Arts I course materials review was overdue and would allow Steinhilber and Bunnow to consider the impact that the impending Common Core requirements would have on the course's materials.[17]

¶77 Steinhilber and Bunnow adapted some of the procedures set forth in Rule 361 and the Handbook for the creation and operation of this Review Committee.

¶78 The Review Committee was a unique entity created to respond to a unique concern.

¶79 The rule on which the majority opinion relies to establish creation of the Review Committee is Rule 361 adopted

---

[17] See Appleton Area School District Board of Education, Meeting Minutes (Apr. 23, 2012).

by the Appleton Area School District Board of Education. The full text of this Rule and an excerpt from the Handbook are in the record and fortunately are attached to the majority opinion. Examining these documents, a reader cannot find a reference to the Review Committee at issue in the instant case in Rule 361 or in the Appleton Area School District Assessment, Curriculum and Instruction Handbook.

¶80 Rule 361 delegates the School Board's legal responsibility for all educational materials, that is, for curriculum material selection and revision, to District personnel, namely the District's ACI Department. Rule 361 does not expressly create a committee that handles the selection and revision of educational materials.

¶81 Pursuant to Rule 361, the ACI Department developed the Appleton Area School District Assessment, Curriculum & Instruction Handbook to guide its curriculum revision and materials selection. The School Board approved the Handbook. The Handbook delegates authority to the ACI Department to create a committee that handles full curriculum reviews.

¶82 The Review Committee in the instant case was not a full curriculum review committee and did not even review the full curriculum for this one course. It reviewed the booklist for this one course. In doing its work, the Review Committee used some curriculum selection and review procedures that it adapted from the Handbook.

15

¶83 In addition to governing full curriculum review, Rule 361 also sets forth a process for handling parental objections to educational materials.

¶84 Under Rule 361, a process is set up to address a parent's complaint about educational materials. The complaint would be given to a school official or staff member who is required to try to resolve the issue informally. If informal resolution is ineffective, Rule 361 creates an Educational Materials Review Committee to address the parental concern and sets forth a procedure for the Committee to follow. The Educational Materials Review Committee's recommendation is subject to the Superintendent's review before the School Board ultimately decides whether or not to adopt the recommendation.

¶85 I agree with the court of appeals that the Review Committee at issue in the instant case did not constitute a Rule 361 Educational Materials Review Committee and was not a committee created by Rule 361 or the Handbook to conduct a full curriculum review.[18]

---

[18] "[H]ere, neither Board Rule 361.1 procedure was applicable, because Krueger requested creation of an alternate course altogether since, in his opinion, 'to review the existing reading list would have been a waste of time.' There was no established district procedure for requesting an alternative course or responding to such a request. . . . [Steinhilber's and Bunnow's creation of the Review Committee on their own initiative] is similar to the second set of facts addressed in the Tylka letter, at 4, wherein the attorney general's office opined the open-meetings law would not apply." State ex rel. Krueger v. Appleton Area Sch. Dist. Bd. of Ed., No. 2015AP231, unpublished slip op. ¶¶20-21 (Wis. Ct. App. June 28, 2016).

16

¶86 In sum, read carefully and liberally, neither Rule 361 nor the Handbook created the Review Committee at issue in the instant case. The majority opinion seems to agree with my wrap up but concludes that this omission in Rule 361 is not meaningful, stating:

> Although [Rule 361 and] the Handbook did not specifically constitute [the Review Committee] by name, [they] authorized review committees . . . to exist and to exercise the Board's delegated authority over curriculum review.

Majority op., ¶39.[19]

¶87 Fourth, the majority opinion, ¶41, states that it need not address the issue of whether the Review Committee was created by an order because it holds that it was created by rule. The meaning of the word "order" was addressed by several of the briefs in this court.[20]

¶88 The parent's brief submits the following regarding government officials creating a governmental body by order :

---

[19] The majority opinion relies on depositions to interpret Rule 361. Is not the interpretation of Rule 361 a question of law for this court, not for the deponents? The parties' briefs in this court argue whether the parent's brief (and therefore the majority opinion) relies on a proper interpretation of the deponents' responses. This is a summary judgment case and the circuit court concluded that no material facts are in dispute.

I note that the majority opinion states repeatedly that the Review Committee was "authorized" by Rule 361, rather than using the statutory language that the Rule "created" the Committee.

[20] The court of appeals did not address this issue because the parent did not raise it in the circuit court or in his initial appellate brief. State ex rel. John Krueger v. Appleton Area Sch. Dist. Bd. of Ed., No. 2015AP231, unpublished slip op. ¶¶22-26 (Wis. Ct. App. June 28, 2016). See majority op., ¶41.

As a practical and legal matter, governing bodies of public entities . . . cannot make every decision; they must delegate their authority downward. In order to exercise those delegated powers, government officials may choose to create a committee to gather information, make a recommendation, or even make a decision. When an official does so, such committees should be subject to the Open Meetings Law . . . .[21]

¶89 The School Board's brief agrees that a government official can set up committees as governmental bodies included within the Open Meetings law. The Board's position is that the official must act within the scope of properly delegated or vested authority. The Board's view is as follows:

[I]ndividual government officials, acting within the scope of properly delegated authority, may create a committee subject to Open Meetings Law by delegating authority to the committee which has been lawfully charged to the official by the governmental body, in this case the school board. . . . Those committees then, are to be treated as if they had been directly charged by the school board to carry out those functions. . . . The mere creation of a committee by administrative officials is not enough. The requisite conferral of power and authority is required. . . . While directives from lower level executive officials or employees may qualify, the directive must have been delegated or redelegated. It is not enough for a government official to simply create a group to address a governmental function. Rather, the governmental function must have been delegated or redelegated by the governmental body.[22]

¶90 In its non-party brief in this court, the Department of Justice asks the court to describe the creation of a governmental body by order as follows:

---

[21] Plaintiff-Appellant-Petitioner's Brief and Appendix at 43.

[22] Defendant-Respondents' Brief at 35-37 (citations omitted).

18

A "governmental body" under Wis. Stat. § 19.82(1) can be created by an "order" following a directive from an existing governmental body or delegate that authorizes the creation of a body and assigns it duties. However, the definition of a "governmental body" is rarely satisfied when groups of a governmental unit's employees gather on a subject within the unit's jurisdiction.[23]

¶91 The Department of Justice has also opined about an "order" by a government official creating a governmental body under the Open Meetings Law using somewhat different language, as follows:

When an individual government official, acting within the scope of properly delegated authority, creates an advisory body, that body is treated as if it had been created directly by the governmental body with authority over that official.[24]

¶92 The Wisconsin Freedom of Information Council argues in its brief that "order . . . must be broadly construed to include any directive, formal or informal, that creates a body and assigns it duties."[25]

¶93 The brief of the Wisconsin Counties Association asks the court to hold that an official

can create a governmental body subject to the [Open Meetings Law] only when the official is acting in the stead of the extant governmental body. There must be an actual, affirmative delegation of authority.[26]

---

[23] Non-Party Brief and Appendix of the Wisconsin Department of Justice Attorney General Brad D. Schimel at 13.

[24] Letter from Assistant Attorney General Thomas C. Bellavia to Joe Tylka (June 8, 2005).

[25] Non-Party Brief and Appendix of the Wisconsin Freedom of Information Council et al. at 5.

[26] Non-party Brief of Wisconsin Counties Association et al. at 15.

¶94 In light of these divergent views and the facts of the instant case, resolving the meaning of "order" is important. The majority opinion's discussion of an "order" might have helped provide clarity and guidance on this difficult question of the meaning of "order."

¶95 The fifth reason that I do not join the majority opinion is that its mandate is unclear.

¶96 The majority opinion clearly reverses the decision of the court of appeals. Majority op., ¶2. It clearly holds that the Review Committee met the definition of "governmental body" under the Open Meetings Law and was subject to its terms. Majority op., ¶2. And finally, the majority opinion remands the cause "to the circuit court for further proceedings consistent with this opinion."[27] Nothing in the majority opinion tells the circuit court what further proceedings are to be held consistent with the opinion.

¶97 I agree with the parent's briefs on this topic. The parent's brief states that if this court reverses the decision of the Court of Appeals, this court would also conclude that the Open Meetings Law applied to the Review Committee.[28] According to the parent, if the Open Meetings Law applied to the Review Committee, it is undisputed that the School Board did not comply with the Open Meetings Law. The parent's brief proposes that

---

[27] Majority op., mandate line after ¶43.

[28] Plaintiff-Appellant-Petitioner's Brief (John Krueger) at 54.

20

this court remand the matter to the circuit court with directions to determine costs and attorney fees and to enter judgment in favor of the parent.[29]  I agree with this proposal and believe that this is the proper interpretation of the majority opinion's remand.

¶98 Furthermore, it is important to acknowledge that the parent did not and does not request that the Review Committee's actions be voided as a remedy under Wis. Stat. § 19.97(3).[30]

¶99 With regard to voiding any action taken at a meeting held in violation of the open meetings law, the Department of Justice has opined on this subject as follows:

> Under Wis. Stat. § 19.97(3) a court may void any action taken at a meeting held in violation of the open meetings law if the court finds that the interest in enforcing the law outweighs any interest in maintaining the validity of the action.  In the present case, the Task Force's duties were simply to provide recommendations . . . .  The only action that would be "voidable" would be the votes of the Task Force members adopting specific recommendations. Since these were only recommendations to the board and the board has undoubtedly accepted some and rejected others of those recommendations, it is unlikely that any court would void any action taken by the Task Force . . . .

Letter from Assistant Attorney General Alan Lee to District Attorney Joseph F. Paulus, dated June 8, 2001.

---

[29] Plaintiff-Appellant-Petitioner's Reply Brief (John Krueger) at 14.

[30] Plaintiff-Appellant-Petitioner's Reply Brief (John Krueger) at 14, n.3.

21

¶100 Because of the continuing need for clarity and guidance in the meaning of the phrase "created by rule or order" used in Wis. Stat. § 19.82(1), I suggest that school boards and school officials consider the adoption of formal rules or orders for the creation of governmental bodies by rule or order to be governed by the Open Meetings Law. They should consider in their various functions whether they are acting by rule or order, whether they are creating a governmental body subject to the Open Meetings Law, and whether they are clearly delineating the functions and responsibilities of the entity they create. Their designation is, of course, not dispositive for purposes of the Open Meetings Law but would assist them, school employees, and the public.

¶101 For the reasons set forth, I write separately.

¶102 I am authorized to state that Justice ANN WALSH BRADLEY joins this concurring opinion.